Newkirk v. Village of Steger
N.D.Ill.,2004.

United States District Court,N.D. Illinois, Eastern Division.
Elana M. **NEWKIRK**, Michael Sauter, Scott Osantowski, John Presley, Charles Tieri, Terry Lamastus and Paul Palcek, Plaintiffs,
v.
VILLAGE OF **STEGER**, Louis Sherman, in his individual and official capacity as the Village President, **Steger** Police Department, Chief Richard Stultz, in his individual and official capacity, Gregory Rambo, Mary Jo Seehausen, in their individual capacities, Defendants.
No. 02 C 9077.

Sept. 24, 2004.

Luke A. Casson, Dana L. Kurtz, Andreou & Casson, Ltd., Chicago, IL, for Plaintiffs.
Richard Joseph Jacobson, Stephen Douglas Sharp, Michael J. Flaherty, Flaherty & Jacobson, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.

*1 If Plaintiffs' allegations in this action are true, the Village of **Steger** police chief and two officers have essentially waged a vendetta against seven fellow officers either for personal or political reasons. Plaintiffs are seven current and former employees of the Village of **Steger** Police Department ("SPD"). They charge Defendants Village of **Steger** (the "Village"), Village President Louis Sherman, the SPD, Village Police Chief Richard Stultz, police officer Gregory Rambo, and program supervisor Mary Jo Seehausen with violating Plaintiffs' rights through a variety of acts, including testifying falsely before a federal grand jury and intimidating or conspiring with Village residents to lodge false complaints against Plaintiffs. Specifically, Plaintiffs Elana **Newkirk**, a former Telecommunications Officer ("TCO") (*i.e.*, dispatcher) with the SPD; Michael Sauter, Scott Osantowski, John Presley, Terry Lamastus, and Paul Palcek, current and former police officers; and Charles Tieri, former Chief of Police for the Village and a current Village trustee, bring claims of racketeering (Count I), violations of free speech and political association rights (Counts II and III), and discrimination and retaliation based on race, gender, and disability (Counts IV-IX) against Defendants.

Defendants move to dismiss Counts I, III, and VII against all Defendants, Count II as to all Plaintiffs except **Newkirk**, the punitive damages claims in Counts II and IV against the Village, and all claims against the SPD, pursuant to FED. R. CIV. P. 12(b)(6). In addition, Defendants move to strike allegations in the Complaint that they deem immaterial, impertinent, and scandalous. For the reasons set forth here, Defendants' motion to dismiss is granted in part and denied in part, and Defendants' motion to strike is denied.

*FACTUAL BACKGROUND*

I. Procedural History

Plaintiff **Newkirk** filed the original complaint in this matter on December 13, 2002, alleging discrimination based on race, gender, and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000*et seq.*, against Defendants the Village, the SPD, and Village Police Chief Richard Stultz. On July 21, 2003, all Plaintiffs filed a First Amended Complaint against all Defendants, adding claims of racketeering, violations of free speech and association rights, and retaliation. On August 18, 2003, Plaintiffs filed a Second Amended Complaint ("Complaint"), making corrections to Defendants' names.[FN1]

> FN1. Although the document filed on August 18, 2003 is titled "First Amended Complaint," the court presumes this was a typographical error, as the parties' briefs refer to this document as Plaintiffs' Second Amended Complaint. After this motion was fully briefed, Plaintiffs filed a Third Amended Complaint with leave of court.



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

That pleading adds an additional party Plaintiff, Wayne Siegrist, but no new claims or theories. Allegations involving Mr. Siegrist are not considered in this ruling.

II. Parties

According to the Complaint, Plaintiff Charles Tieri served as Chief of Police for the Village from 1963 to 1995, when he was succeeded by Defendant Richard Stultz. (Cmplt.¶ 15.) In 1999, Tieri was elected as a Village trustee and served in that position until 2003. (*Id.*) Plaintiff Michael Sauter was employed by the SPD in an unidentified capacity prior to 1980. (*Id.* ¶ 12.)At the request of an unidentified Village trustee in or about April 1987, Sauter returned to the SPD and currently serves as a police officer. (*Id.*)

*2 Plaintiff Terry Lamastus was a Sergeant in the SPD from in or about January 1980 through late 2000. (*Id.* ¶ 16.)[FN2] Plaintiff Scott Osantowski became a police officer with the SPD on or about January 11, 1989.(*Id.* ¶ 14.)In or about 2002, Osantowski was promoted to Sergeant and continues to hold that position. (*Id.*) Plaintiff John Presley became a police officer with the SPD on or about May 1, 1990 and continues to hold that position. (*Id.* ¶ 13.)Plaintiff Paul Palcek was a Sergeant in the SPD from 1998 through in or about early 2000, when, according to Plaintiffs, he was "forced to resign" as a result of false complaints against him instigated by Defendants Stultz and Rambo. (*Id.* ¶ 17, 86.)Plaintiff Elena **Newkirk** was a TCO with the SPD from in or about April 10, 2000 until January 2002, when "Defendants unlawfully forced [her] resignation and constructive discharge."(*Id.* ¶ 11.)

> FN2. The Complaint does not state why Lamastus ceased to be a Sergeant in late 2000, or whether he is still employed by the SPD or the Village.

Defendant Louis Sherman has served as Village President for more than 30 years. (*Id.* ¶ 19.)Plaintiffs allege that, throughout his tenure as Village President, Sherman has used his position
for his own political and personal advantage and benefit, including using, soliciting, recruiting, and otherwise obtaining services of Village of **Steger** employees to give their time, talent, and money to election efforts of his campaign and [for] other candidates he endorsed for office; retaliating against those who oppose him politically; using Village of **Steger** employees to conduct work for him personally on Village time and at the expense of taxpayer dollars.

(*Id.* ¶¶ 20, 101(f).) Defendant Richard Stultz has been Village Chief of Police since 1995. (*Id.* ¶ 21.)According to Plaintiffs, on several unspecified dates since 1999, the Village Board has voted to terminate Stultz "as a result of the problems with the Police Department, mismanagement and corruption. However, despite these attempts, [Sherman has] repeatedly reappointed [Stultz] to the position of Chief of Police until the Village Board gave up trying to terminate him."(*Id.* ¶ 22.)Plaintiffs also contend that Sherman and Stultz "are close political allies." (*Id.* ¶ 23.)

Defendant Gregory Rambo is a Lieutenant with the SPD. (*Id.* ¶ 24.)Plaintiffs urge that Sherman and Stultz "unlawfully promoted Rambo to the position of 'Commander.' " (*Id.* ¶ 24.)On unspecified dates, Lamastus filed suit in state court "seeking to enjoin the unlawful promotion" and Stultz returned Rambo to the position of Sergeant. The Complaint does not state whether Stultz did so as a result of the lawsuit, nor does the Complaint explain why Lamastus believed Rambo's promotion was unlawful. Plaintiffs assert that on subsequent unspecified dates, Stultz "again attempted to unlawfully promote Rambo to 'Assistant Chief,' [but] later retracted the appointment with the threat of litigation." (*Id.*) Defendant Mary Jo Seehausen supervises the TCO program; the Complaint does not state when she assumed that position.(*Id.* ¶ 25.)

III. Purported Adverse Actions

*3 The Complaint alleges a series of adverse actions dating from 1996.

A. 1996-1997

According to the Complaint, in or about 1996, Stultz "conspired [with] or directed Seehausen" to file "false and frivolous charges" that Lamastus had sexually harassed her. (*Id.* ¶ 72.)The purpose of these false charges was " 'to get' Plaintiff Lamastus." (*Id.*) As a result of these allegations, on an unspecified

date, Lamastus was placed on administrative leave for more than 14 months. (*Id.*)

Also in or about 1996, Rambo "encouraged, directed, and/or conspired with former radio operators and citizens ... to solicit false complaints against [Lamastus] to bring him up on charges of sexual harassment."(*Id.* ¶ 73.)In or about 1996 or 1997, an unidentified former Village employee informed Lamastus that Rambo "had approached her and attempted to coerce her into filing false charges against" Lamastus. (*Id.* ¶ 74.)

In 1997, Stultz "encouraged, directed, and/or conspired with" unidentified individuals to file suit in federal court falsely accusing Lamastus of "stalking" an unidentified female complainant. (*Id.* ¶ 76.)On an unspecified date, the case was dismissed for "want of prosecution, failure to cooperate with her attorney, and failure to comply with the Court's order."(*Id.*) In or about 1997, an unidentified individual informed Sauter that an unnamed trustee who had a services contract with the Village had walked into Stultz's office and had seen Stultz and Seehausen "in a state of undress." (*Id.* ¶ 75.)On unspecified dates, other unidentified employees had also seen Stultz and Seehausen "in various states of undress and precarious situations."(*Id.*) Sauter "reported this information up the chain of command."(*Id.*) When he learned that Sauter had reported these allegations, Stultz told Sauter that he had "ruined his [Stultz's] chances of using Seehausen 'to get' [Lamastus]."(*Id.*)

Also in or about 1997, Stultz accused Palcek of "conspiring with a female employee to make false allegations of sexual harassment against [Seehausen's] brother," who was then employed as a TCO with the SPD. (*Id.* ¶ 81.)According to Plaintiffs, Palcek had merely assisted the woman with her complaint in his capacity as Union President. (*Id.*) On an unspecified date, the SPD terminated the unidentified female's employment. (*Id.*) On an unspecified date, Seehausen's brother resigned, but "a short time later, [he] was hired as a police officer and promoted with[in] the Department."(*Id.*)

In or about 1997 or 1998, Rambo ordered Lamastus to "write up" Osantowski on unspecified charges "without cause or justification." (*Id.* ¶ 77.)[FN3]Also in or about 1997 or 1998, Stultz and Rambo "encouraged, directed, and/or conspired with another to file false charges against" Sauter, and Stultz himself "brought [Sauter] up on false charges[,] for leaving town and transporting a suspect without authorization."(*Id.* ¶ 38.)Plaintiffs allege that Sauter had received authorization from his superior officer to transport the suspect and had acted in accordance with Departmental policy. (*Id.*) On or around the date when these charges were filed against Sauter, an unidentified individual removed Palcek from his position as acting Watch Commander "without notice, justification, or explanation." (*Id.* ¶ 82.)Subsequently, unspecified individuals investigated Sauter, subjected him to "a formal departmental interrogation without being provided his right to counsel" in violation of the Uniform Peace Officers Disciplinary Act ("UPODA"), 50 ILCS 725/1*et seq.*, and suspended him for 12 weeks "pending termination." (*Id.* ¶ 38.)On an unspecified date, the charges relating to the transportation of the suspect were dropped. (*Id.*)

> FN3. The Complaint does not state whether Lamastus complied with Rambo's alleged order.

B. 1998-1999

*4 In or about 1998 or 1999, an unidentified Village resident who had been involved in an unspecified accident "handled by" Lamastus, Osantowski, and Presley, told Lamastus that Defendants Rambo and Officer Gerald Ruff had asked him to file false charges against Lamastus and Osantowski and to lie about how Plaintiffs had handled the incident. (*Id.* ¶¶ 59, 78.)On an unspecified date, Officer Ruff again contacted the accident victim and told him that if he did not file a false complaint against Plaintiffs claiming that they had mishandled the call, then the individual's "employer would be contacted and there would 'be trouble.' " (*Id.*) Stultz "was also involved in and conspired or directed the intimidation and extortionist tactics" against the Village resident. (*Id.*)[FN4]

> FN4. The Complaint does not state whether this individual ever filed a complaint against Plaintiffs.

In or about March 1998, Rambo and Stultz "directed, encouraged, and/or conspired with another to make false allegations against [Osantowski] for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

'conduct unbecoming a police officer,'" based on photographs Osantowski had taken in 1996 or 1997 of a woman who had been beaten in a domestic violence incident. (*Id.* ¶ 56.)Plaintiffs claim that Osantowski took these photographs "pursuant to proper policy and procedure" in order to document the bruises on her body. (*Id.*) Plaintiffs allege that as a result of these false charges, Osantowski "was subjected to unwarranted disciplinary action and suspended without probable cause [or] his right to due process." (*Id.*)

On April 12, 1999, Rambo, "with the knowledge, direction, consent, and/or by agreement with" Stultz and Sherman, claimed in a letter to Village residents that Tieri was running for Village trustee "because the Village would not provide him with 'free gas' and a 'vehicle'" and because he wanted to obtain "more time at the 'Cash Flow' window." The letter suggested that Tieri had committed unspecified illegal acts and stolen public funds. (*Id.* ¶ 63.)Plaintiffs claim that these allegations were "false and committed with the intent of discrediting [Tieri and to defame] his character, and to prevent his election to the Village Board." (*Id.*)

C. 2000

In 2000, Stultz "consulted, directed, and/or conspired with the Village of **Steger** Police Association and other individuals" to claim falsely that Tieri "had improperly pocketed money from a vending machine he owned and operated."(*Id.* ¶ 64.)[FN5]Stultz told an unidentified individual or individuals that he had asked the Cook County State's Attorney's Office to investigate this claim. (*Id.*)[FN6] Plaintiffs allege that Stultz took these actions "in retaliation for [Tieri's] political appointment to the Village Board and opposition to [Village President Sherman] and to defame and destroy his character and deprive him of his liberty and property rights."(*Id.*)

> FN5. The court is uncertain how Tieri's taking money from a vending machine he owned was characterized as improper, and therefore presumes that Stultz asserted that Tieri did not in fact own the vending machine.

> FN6. The Complaint does not state whether Stultz ever asked the Cook County State's Attorney's Office to investigate the complaint or whether such an investigation was undertaken.

In or about 2000, with Sherman's knowledge and consent, Stultz and Rambo attempted to "put the squeeze on" an unidentified Village employee to persuade him to testify falsely that, on an unspecified date, Tieri was involved in an unspecified manner in an arson. (*Id.* ¶ 65.)On an unspecified date, Stultz "met with the employee and defamed [Tieri's] character in an attempt to coerce the employee to provide false statements against [Tieri]."(*Id.*)When the employee refused to implicate Tieri, Stultz stood up and exclaimed, "you are a f ing liar."(*Id.*) Plaintiffs claim that the employee "felt intimidated and threatened as a result of the incident."(*Id.*)

*5 At some point between 2000 and 2002, an unidentified employee (presumably of the SPD) placed an unspecified amount of bond money into her pocket, forgot to return the money to its proper unspecified location, and took the money home. (*Id.* ¶ 27.)When another unidentified SPD employee discovered that the money was missing, Seehausen told yet another unidentified employee (presumably of the SPD) that "Osantowski was in the radio room and 'therefore must have taken it.'" (*Id.* ¶¶ 27, 58.)Seehausen also accused **Newkirk** of stealing the money, and she told an unidentified individual or individuals that Osantowski and **Newkirk** were "thieves." (*Id.* ¶ 27.)Plaintiffs claim that Seehausen's accusation was "without probable cause, investigation, ... evidence" or "justification." (*Id.* ¶¶ 27, 58.)

In or about January 2000, Rambo, "with the consent, knowledge, or by agreement with Stultz and Sherman," falsely reported to the Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") that Sauter and Tieri had stolen guns from the SPD. (*Id.* ¶¶ 41, 66.)Plaintiffs maintain that Sauter did not in fact steal the guns; rather, he had received permission from Stultz and his commanding officers (who are not named) to store the guns for the SPD because Sauter was the Range Officer and because the SPD's evidence room "was 'a disaster.'" (*Id.*) On an unspecified date, the ATF began an investigation of the incident, during the course of which an unidentified individual or individuals observed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rambo meeting with an unidentified ATF agent in an unspecified forest preserve. (*Id.* ¶¶ 43, 67.)

On March 6, 2000, Osantowski filed a lawsuit against the Village in the United States District Court for the Northern District of Illinois alleging discrimination on an unspecified basis, *Osantowski v. Village of Steger*, No. 00 C 1353.(*Id.* ¶ 48.)In or about April 2000, Rambo and Stultz directed an unidentified TCO to approach Sauter and Presley and to "attempt to have them 'restore' an illegal sawed off shotgun in hopes to set them up for criminal and departmental charges"; Sauter and Presley did not do so. (*Id.* ¶¶ 42, 51.)Within a few months after this incident, an unidentified individual or individuals offered this unidentified TCO a full-time position as a police officer. (*Id.*)

During the Spring of 2000, an unspecified individual or individuals warned **Newkirk** to "watch out how things would change for her if she became friends with" Osantowski, Presley, and Sauter. (*Id.* ¶ 29.)On May 10, 2000, Seehausen told **Newkirk** to document problems with Sauter and to submit weekly reports on his activity, "expecting that she would make false complaints against him."(*Id.* ¶ 28.)**Newkirk** was subject to unspecified retaliation because she refused to make such false complaints. (*Id.*)

On May 19, 2000, Rambo sent a memorandum to Sauter, Osantowski, Presley, and other employees (presumably of the SPD), in which he stated that an unspecified individual or individuals had told him that unidentified employees were "having problems" with **Newkirk** and requested that complaints about **Newkirk** be forwarded to him. (*Id.* ¶ 30.)On an unspecified date, while **Newkirk** was not at the station, an unidentified Village resident made a telephone call to the SPD. (*Id.* ¶ 31.)On an unspecified date, Rambo and Sergeant Rossi [FN7] approached the Village resident, told her that the SPD wanted to "get rid" of a TCO, and asked her to sign a false complaint against **Newkirk**. (*Id.*) The resident filed a complaint regarding the call, and on or about July 14, 2000, Seehausen "wrote [**Newkirk**] up" and subjected her to unspecified disciplinary action as a result of this incident. (*Id.*)

FN7. The Complaint does not state Sergeant Rossi's first name.

\*6 On August 14, 2000, Seehausen called **Newkirk** into the station and read to her unspecified "false and fraudulent" written allegations. (*Id.* ¶ 32.)Seehausen then handed **Newkirk** the document, which included in effect the following statement: "Elana has replied that her lack of dispatching was due to *laziness* and these will be the items she works on."(*Id.* (emphasis original).) Seehausen told **Newkirk** to sign the document, but **Newkirk** refused to do so. (*Id.*) Seehausen told **Newkirk** that she would be terminated immediately if she did not sign the document and stated that "the Chief [Stultz] wants to fire you right now."(*Id.*)

On an unspecified date, Osantowski stopped a female juvenile for a curfew violation and found that she was highly intoxicated. (*Id.* ¶ 61.)Osantowski called the individual's father and told him to pick her up from the station "without further incident." (*Id.*) In or about October 2000, Stultz and Rambo "encouraged, directed, and/or conspired with the female juvenile to make" unspecified false allegations against Osantowski. (*Id.*) Plaintiffs claim that "[t]hese false allegations were made ... in an effort to intimidate [Osantowski] into dropping his complaint" in *Osantowski v. Village of Steger*, *supra*, and to defame his character. (*Id.* ¶ 62.)

On October 8, 2000, Sauter, Presley, and Osantowski were called to the scene of a battery, where they arrested two suspects, one of whom was a juvenile, after receiving positive identification from the victim. (*Id.* ¶¶ 47, 52, 60.)In November 2000, Stultz called Sauter and Presley into a meeting and questioned them regarding the incident. (*Id.*) Nearly one year later (Plaintiffs do not state precisely when), Stultz and Rambo initiated an investigation of Sauter and Presley. (*Id.*) During the formal Departmental Interrogation, Sauter and Presley "were denied [their] right to counsel" and "denied [their] rights" under the UPODA. (*Id.*) On an unspecified date, an unidentified individual or individuals threatened to file false charges against Sauter and Presley (presumably relating to the October 8, 2000 incident) for breaking and entering and threatening to "sexually assault" and commit battery on a minor. (*Id.*)[FN8] On an unspecified date, Sauter and Presley were subjected to unspecified disciplinary action stemming from these "false charges." (*Id.*) On an unspecified date, Rambo and Stultz "intercepted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and/or conspired with others to have the criminal charges against the suspects intercepted as the charges never made it to court and the suspects were never prosecuted and the bond money had disappeared."(*Id.*) Rambo and Stultz "encouraged or conspired with the suspects to file federal civil rights lawsuits against Plaintiffs based on these false accusations."(*Id.*) Plaintiffs claim that "[t]hese false allegations were made ... in an effort to intimidate [Sauter] from testifying on [Osantowski's] behalf" in *Osantowski v. Village of Steger, supra.*(*Id.* ¶ 48.)

> FN8. The Complaint does not state whether such charges were ever filed.

*7 In November 2000, in an attempt to "set up" Osantowski on false charges, Rambo and Seehausen called **Newkirk** into a meeting and "interrogated" her regarding an unspecified incident involving Osantowski and an unidentified "female juvenile." (*Id.* ¶ 33.)On an unspecified date, **Newkirk** "provided a taped statement regarding the incident"[FN9] to an unidentified individual or individuals. (*Id.*) Approximately one week later, Rambo told **Newkirk** that an unspecified individual or individuals were investigating Osantowski for "indiscretions" and that he could make her a full-time TCO [FN10] if she would lie regarding the incident involving the female juvenile and Osantowski.(*Id.*) The Complaint does not state whether **Newkirk** complied with Rambo's alleged request. On an unspecified date, Rambo and Seehausen, "with the consent, knowledge, direction, or agreement of Stultz and Sherman, threatened [**Newkirk**] with false arrest if she did not sign off on a false complaint against" Osantowski regarding an unspecified incident with a female prisoner.(*Id.* ¶ 34.)[FN11]

> FN9. It is not clear from Plaintiffs' allegations whether **Newkirk's** taped statement related to the alleged incident involving Osantowski, or to the interrogation by Rambo and Seehausen.
>
> FN10. The court presumes **Newkirk** was a part-time employee as of November 2000.
>
> FN11. The Complaint does not indicate whether this is the same incident described in ¶ 33, *supra.*

D. 2001-2002

In late 2000 or early 2001, Stultz and/or Rambo falsely told the ATF that Palcek had stolen guns from the SPD. (*Id.* ¶ 83.)As a result, the ATF investigated Palcek. (*Id.*) On an unspecified date, an unidentified individual told Palcek that if he testified on behalf of Sauter (presumably in connection with the guns), he would also be indicted. (*Id.*) Plaintiffs allege that no formal charges were brought against Palcek "because the case was settled before trial."(*Id.*)[FN12] On an unspecified date, the ATF terminated their investigation of Palcek, but Palcek was not informed of this fact until January or February 2003. (*Id.* ¶ 84.)On an unspecified date, an unidentified member of the "command staff" [FN13] told Palcek that Stultz and Rambo had approached unidentified Village residents and "asked them to make false complaints against Plaintiffs."(*Id.* ¶ 85.)According to Plaintiffs, in or about early 2000, Palcek was "forced to resign as a result of Defendants' conduct."(*Id.* ¶¶ 17, 86.)

> FN12. The Complaint does not state what case this statement refers to.
>
> FN13. The Complaint does not define the term "command staff."

In March 2001, Stultz and Rambo filed "false and frivolous" charges with the Illinois State Police and the Will County State's Attorney's Office "without probable cause or justification," claiming that Lamastus had "unlawfully sold construction equipment at an inflated price to 'pay off' " Tieri and an unidentified Village employee. (*Id.* ¶ 80.)Defendants also attempted to have Lamastus "wrongfully brought up on criminal charges." (*Id.*)[FN14] On March 22, 2001, the *Star Newspapers* reported that Stultz had stated (without referring to Lamastus directly) that Lamastus had been suspended for 15 months because he had "harass[ed] witnesses" and two Village employees had filed complaints against him alleging sexual harassment. (*Id.* ¶ 79.)Stultz, Rambo, and Seehausen "made, directed, and/or conspired with others to make these false and defamatory allegations against" Lamastus. (*Id.*)

> FN14. The Complaint does not state whether such criminal charges were ever filed against Lamastus.

\*8 In the fall or winter of 2001, Rambo told a female applicant for a TCO position with the Village that she would be hired if she would falsely testify that Osantowski had sexually harassed her. (*Id.* ¶ 57.)[FN15] In or about late 2001, Stultz and Rambo "made, directed, and/or conspired with another to make false, defamatory, and outrageous allegations against Plaintiffs Presley and Osantowski, claiming that [Osantowski] and/or Presley had 'handcuffed a woman to her bed for sexual gratification.'" (*Id.* ¶ 53.)Plaintiffs maintain that Presley and Osantowski had merely "responded to a domestic disturbance and [had] handled the call appropriately." (*Id.*) Nearly one year later (Plaintiffs do not state precisely when), "Rambo questioned [Presley] regarding the incident and subjected him to a formal departmental interrogation" in which Rambo "deprived [Presley] of his right to counsel in violation of" the UPODA. (*Id.*) Presley was never given a copy of the complaint. (*Id.*)[FN16] Plaintiffs claim that "[t]hese false allegations were made ... in an effort to intimidate [Presley] from testifying on [Osantowski's] behalf" in *Osantowski v. Village of Steger.*(*Id.* ¶ 54.)

> FN15. The Complaint does not state whether the applicant ever testified against Osantowski.

> FN16. The Complaint does not state whether Presley requested a copy of the complaint.

On January 4, 2002, Stultz, Rambo, and Seehausen called **Newkirk** into a meeting in which they "wrongly and without probable cause or evidence accused [**Newkirk**] of 'falsifying' documents."(*Id.* ¶ 36.)Defendants denied **Newkirk's** request to see the documents she had allegedly falsified. (*Id.*) Stultz told **Newkirk** that if she did not resign, he would arrest her for "falsifying records," which he told her was a felony. (*Id.*) At some point in January 2002, **Newkirk** resigned. (*Id.* ¶ 11.)

In March 2002, Rambo provided unspecified false testimony under oath before a federal grand jury impaneled on an unspecified date to review charges relating to the allegations that Sauter, Tieri, and Palcek had stolen guns. (*Id.* ¶¶ 44, 68.)Allegedly as a result of Rambo's actions, Sauter was encouraged to and ultimately did plead guilty to "a misdemeanor charge about a 'paper mistake.'" (*Id.* ¶ 44.)In a May 12, 2002 article, Michael Drakulich, a reporter for *Star Newspapers,* quoted Stultz as stating that the gun investigation "started when the department staff began to notice several guns officers had confiscated were missing from the inventory." (*Id.* ¶¶ 45, 69.)Plaintiffs claim, however, that the SPD and Stultz "knew full well where the guns were." (*Id.*) Plaintiffs contend that "Stultz and/or Rambo provided this information about the ATF investigation to the press in hopes and with the effect of destroying [Sauter's and Tieri's] character and reputation." (*Id.* ¶¶ 45, 70.)[FN17]

> FN17. Plaintiffs do not allege that this article was intended to injure Palcek.

E. Undated Incidents

The Complaint does not provide dates for the following allegations. Throughout the employment of Plaintiffs Sauter, Presley, Osantowski, and Lamastus with the SPD, Defendants Stultz, Rambo, and Seehausen "told and directed" unidentified employees (presumably of the SPD) to "watch" these Plaintiffs, to write complaints against them, and to "set them up for disciplinary action and/or termination."(*Id.* ¶¶ 37, 49, 55, 71.)Throughout **Newkirk's** employment with the SPD, Rambo and Seehausen, "with knowledge, consent, and/or acquiescence of [Stultz], repeatedly directed, encouraged, attempted to coerce, and/or conspired with other employees and [Village residents] to make false complaints against [**Newkirk**] without justification or probable cause."(*Id.* ¶ 35.)Seehausen told **Newkirk** to "watch out" for Presley, Osantowski, and Sauter, as Presley "likes to chase women" and Osantowski is "under investigation" because he "likes to play with little girls."(*Id.* ¶¶ 26, 37.)[FN18] According to Plaintiffs, Seehausen "knew these statements were false." (*Id.* ¶ 26.)

> FN18. The Complaint does not indicate what, if anything, Seehausen told **Newkirk** regarding Sauter.

\*9 Stultz "interrogated" Sauter regarding an incident involving an arrest of two or three "juvenile suspects." (*Id.* ¶¶ 40, 50.)Rambo ordered Sauter, Presley, and another unidentified officer to provide a "to/from" (presumably, a memorandum) regarding the incident. (*Id.*) In an attempt to "intimidate and scare" Sauter, Stultz made a (presumably false) claim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that there was an excessive force claim against them (presumably filed by the juveniles) and that the Village could not indemnify them if the suspects sued them. (*Id.*) Defendants "encouraged, coerced, and/or conspired with the juvenile suspects to file false complaints against" Sauter, Presley, and the other unidentified officer, who resigned as a result of this incident. (*Id.*) No charges were in fact filed against any of the Plaintiffs in connection with this incident, and Plaintiffs never received a copy of the alleged complaint or any related documents. (*Id.*)[FN19] An unidentified individual "who now holds a high-ranking position with the Village" told Sauter "to watch [your] back, they are still coming for [you]."(*Id.* ¶ 46.)

>FN19. The Complaint does not state whether charges were filed against the unidentified officer.

*DISCUSSION*

I. Motion to Dismiss

As noted, Plaintiffs charge that the conduct alleged in the Complaint constitutes racketeering, retaliation in violation of Plaintiff's First Amendment rights, discrimination against **Newkirk** on the basis of gender and disability, and discrimination against **Newkirk** and Osantowski on the basis of race. Defendants seek dismissal of all claims other than **Newkirk's** First Amendment claim and the race discrimination claims.

A. Legal Standard

The purpose of a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). On a motion to dismiss, the court accepts all well-pleaded allegations in a claim as true and draws all reasonable inferences in favor of the plaintiff. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 977-78 (7th Cir.1999) (citation omitted). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief."*Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In other words, a complaint will survive a 12(b)(6) motion if it "narrates an intelligible grievance that, if proved, shows a legal entitlement to relief."*U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir.2003) (citations omitted).

B. Count I (RICO)

In Count I of their Complaint, Plaintiffs claim that Defendants conducted the affairs of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). (Cmplt.¶ 88.) [FN20]Alternatively, Plaintiffs allege that Defendants conspired to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of RICO § 1962(d).(*Id.* ¶ 89.)[FN21]Plaintiffs contend that Defendants have engaged in two or more predicate acts as defined by RICO § 1961(1), including but not limited to the following:

>FN20. The Complaint cites § 1964(c), but the court presumes this resulted from a scrivener's error, as § 1964(c) merely authorizes civil remedies for violations of § 1962.

>FN21. Although the Complaint cites both §§ 1964(d) and 1962(d), the court presumes Plaintiffs intended to cite only the latter section, as § 1964(d) relates only to criminal proceedings.

*10 1. Obstruction of justice in violation of § 1503;
2. Obstruction of criminal investigations in violation of § 1510;
3. Tampering with witnesses and victims in violation of § 1512;
4. Retaliating against witnesses and victims in violation of § 1513;
5. Interference with commerce, robbery, or extortion in violation of § 1951 (the Hobbs Act); and
6. Engaging in racketeering in violation of § 1952 (the Travel Act).

(*Id.* ¶ 90.)Plaintiffs urge that "Defendants affected, attempted, and conspired to affect interstate commerce through extortion of Plaintiffs and other victims."(*Id.* ¶ 91.)According to Plaintiffs, "Defendants engaged in extortion of Plaintiffs by ... actual and threatened use of force, fear, and under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

color of official right."(*Id.* ¶ 92.)Plaintiffs claim that Defendants, as well as "others known and unknown to Plaintiffs," were associated in fact and constituted an "enterprise" as defined in § 1961(4).(*Id.* ¶ 93.)Plaintiffs allege that this enterprise "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise."(*Id.* ¶ 95.)According to Plaintiffs, Defendants Sherman, Stultz, Rambo, and Seehausen were able to commit the predicate offenses described above because of their positions.(*Id.* ¶ 96.)Plaintiffs allege that Defendants' conduct, described in ¶¶ 26-86 *supra,* constitutes a pattern of racketeering activity "in that Defendants ['] actions have extended over several years and have the threat of continuing in the future." (*Id.* ¶ 100.)

In addition to the incidents described in ¶¶ 26-86 of their Complaint, Plaintiffs make the following further claims in Count I. In or about July 2002, Stultz, with unspecified involvement by Seehausen, told a female TCO that if she did not resign, he would falsely charge her with theft. (*Id.* ¶ 101(a).) On February 7, 2002, Larry Nardoni, former **Steger** School District 194 Board President, filed a complaint, which he amended on October 2, 2002, in the United States District Court for the Northern District of Illinois, *Nardoni v. Moke,* 02 C 944, alleging that Stultz, the Village, the School District Superintendent, and two Village police officers "engaged in a conspiracy to make and publicize false and malicious charges of criminal misconduct against Nardoni and his daughter with the intent and effect of punishing Nardoni for engaging in protected First Amendment speech."(*Id.* ¶ 101(b).)[FN22] On an unspecified date or dates, unidentified individuals stated publicly that "if you are of the wrong political persuasion in **Steger**, *be aware* you are likely to be investigated even if you have done nothing wrong."(*Id.* ¶ 101(c) (emphasis added by Plaintiffs).) On an unspecified date, Stultz warned that he "can get anyone charge[d] with an offense to discredit them."(*Id.* ¶ 101(d).) On unspecified dates, Sherman, Stultz, and Rambo "engaged in and conspired with others to rig various bids for work to be contracted with the Village of **Steger** and the **Steger** Police Department" in two ways. First, Defendants gave contracts to "potential and existing contractors who are political supporters of Sherman and the candidates he endorses for other offices" without engaging in the required bidding process. Second, "various work was performed without obtaining a bid that was over the requisite amount and financial transactions were structured so that the amounts paid did not appear in excess of the statutory amount required for obtaining a bid."(*Id.* ¶ 101(e).)

> FN22. The court notes that the parties ultimately settled this case, and Nardoni dismissed his claims on April 1, 2003.

**\*11** Defendants urge that Plaintiffs do not adequately allege the existence of an enterprise. (Def.12(b)(6) Motion, at 3-4.) [FN23]To establish a RICO claim under § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985) (footnote omitted).Section 1962(d) makes it unlawful for a person to conspire to violate § 1962(c); thus, Plaintiffs must state a claim under § 1962(c) in order to establish a cause of action under § 1962(d).*See, e.g., Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 677 (7th Cir.2000) ("Since Appellants fail to establish a violation of section 1962(c), their section 1962(d) claim based on the same facts must fail as well") (citing *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1026 (7th Cir.1992)).

> FN23. Defendants' Rule 12(b)(6) Motion to Dismiss Count I of the Second Amended Complaint as to All Plaintiffs, Count II as to All Plaintiffs Except **Newkirk**, Count III as to All Plaintiffs, Count VII, the Punitive Damages Claims in Counts II and IV against the Village of **Steger**, and the **Steger** Police Department is cited as "Def. 12(b)(6) Motion, at ___."

Our Court of Appeals has explained that "a RICO complaint must identify the enterprise."*Stachon,* 229 F.3d at 675 (citing *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 645 (7th Cir.1995)). An "enterprise" under RICO includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."18 U.S.C. § 1961(4). A RICO enterprise can be formal or informal, but there must be some type of organizational structure. *Stachon,* 229 F.3d at 675 (citing *Richmond,* 52 F.3d at 645;*Bachman v. Bear, Stearns & Co., Inc.,* 178 F.3d 930, 931 (7th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1999)).“[G]overnmental or public entities [such as the Chicago Police Department] fit within the definition of 'enterprise' for purposes of RICO.”<u>United States v. Kovic, 684 F.2d 512, 516 (7th Cir.1982)</u> (citations omitted).

A RICO enterprise is "more than a group of people who get together to commit a 'pattern of racketeering activity.'" <u>Stachon, 229 F.3d at 675</u> (quoting <u>Richmond, 52 F.3d at 645).</u> Instead, a RICO enterprise must have "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making." <u>Id.</u> (quoting <u>Jennings v. Emry, 910 F.2d 1434, 1440 (7th Cir.1990)</u>). This organization must have "a structure and goals separate from the predicate acts themselves." <u>Id.</u> (quoting <u>United States v. Masters, 924 F.2d 1362, 1367 (7th Cir.1991)</u>). In addition, a RICO defendant or "person" must be "separate and distinct from the enterprise," <u>id.</u> at 676 n. 3 (citing <u>Richmond, 52 F.3d at 646-47),</u> because "liability depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs, through a pattern of racketeering activity." <u>Id.</u> (quoting <u>Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993))</u> (internal quotation marks omitted); <i>see also</i> <u>Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001)</u> ("to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").

*12 Defendants urge that Plaintiffs' "conclusory allegations" fail adequately to allege an enterprise with a structure and goals separate from the alleged predicate acts. (Def.12(b)(6) Motion, at 4.) In support, Defendants cite <u>Shapo v. O'Shaughnessy, 246 F.Supp.2d 935 (N.D.Ill.2002),</u> in which the court dismissed a complaint as to all but two defendants, on the ground that plaintiff, the liquidator of a defunct insurance company, had not described the structure or activities of the purported enterprise:

The Liquidator does not describe this structure [of the alleged enterprise] at all, nor does he explain which affairs the purported enterprise conducted. The Liquidator only alleges in a conclusory fashion that the association-in-fact enterprise "functioned in a hierarchical decision-making structure as a continuing unit from at least 1989 to 1996, and was engaged in and the affairs of which affected interstate commerce."An enterprise cannot exist with only these bare allegations. <i>See</i> <u>Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676-77 (7th Cir.2000)</u> (affirming dismissal of complaint where plaintiff did not offer a "command structure" and failed to define what the enterprise "supposedly does.").

<i>Id.</i> at 962.

Plaintiffs here urge that they have alleged sufficient facts to suggest "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making."(Pl.12(b)(6) Resp., at 6.) [FN24] Plaintiffs point to ¶¶ 18-25 of the Complaint, which describe Defendants and allege that Sherman has used the Village for his political and personal benefit; that Sherman has repeatedly reappointed Stultz after the Village Board has voted to terminate him; that Sherman and Stultz "are close political allies"; and that Sherman and Stultz twice attempted to promote Rambo unlawfully. Plaintiffs claim that these allegations "show that the enterprise is organized in a manner amen[ ]able to hierarchical or consensual decision-making. There is a command structure and an 'association-in-fact' between all Defendants, where each participated in the operation and management of the enterprise."(<i>Id.</i>) Plaintiffs contend that <i>Shapo</i> supports their argument that they have sufficiently pleaded the existence of an enterprise. (<i>Id.</i> at 6-7.)They note that the <i>Shapo</i> court found that the complaint sufficiently alleged that two of the corporate defendants did constitute an enterprise, as plaintiff had "alleged the breakdown of responsibilities in the enterprise, as well as the structure, hierarchical relationship, and common purpose of the association."<u>246 F.Supp.2d at 963</u>.

> FN24. Plaintiffs' Response to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint is cited as "Pl. 12(b)(6) Resp. at ___."

Plaintiffs also cite a string of additional cases that, they claim, support the existence of an enterprise. In <u>United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981),</u> the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

government claimed that 13 defendants had formed an enterprise consisting of "a group of individuals associated in fact for the purpose of illegally trafficking in narcotics and other dangerous drugs, committing arson, utilizing the United States mails to defraud insurance companies, bribing and attempting to bribe local police officers, and corruptly influencing and attempting to corruptly influence the outcome of state court proceedings...."*Id.* at 578-79.The Court explained that an enterprise "is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct .... [and] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."*Id.* at 583 (citing 18 U.S.C. § 1961(1)). The Court reversed the lower court's determination that the term "enterprise" as used in RICO did not include organizations that are exclusively criminal. *Id.* at 578.The Court did not, however, determine whether the indictment had sufficiently alleged an ongoing organization in which defendants functioned as a continuing unit.

**\*13** In *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.,* 62 F.3d 967 (7th Cir.1995), the purpose of the alleged enterprise was to make plaintiff's competitor "the exclusive provider of forklift and material handling and personnel moving equipment for all exhibition contractors at McCormick Place."*Id.* at 978.The lower court dismissed the complaint, finding that the two defendants had merely carried out all activities on behalf of the alleged enterprise "at the direction of" one or more other members of the enterprise (whom plaintiff had previously dismissed voluntarily).*Id.* In reversing and remanding the case, the Court of Appeals explained that, despite the fact that they acted only at the direction of others, defendants nevertheless might be liable as "lower-rung participants who are under the direction of upper management."*Id.* at 979.The court left it to the district court to determine on remand whether plaintiff had adequately alleged the existence of a RICO enterprise. *Id.* at 981.

The plaintiffs in *DeFalco v. Bernas,* 244 F.3d 286 (2d Cir.2001), claimed that their real estate development efforts were illegally impeded as a result of the defendants' operation of the Town of Delaware, New York, as a RICO enterprise. *Id.* at 293.Plaintiffs argued that defendants-including public officials, private individuals, and corporations, but not the town itself-engaged in a conspiracy, plan and scheme to use the town as a racketeering enterprise to extort money, real property and personal property through misuse of certain public offices. *Id.* The court explained that "[i]t is well established in this Circuit that, under § 1962(c), the alleged RICO 'person' and RICO 'enterprise' must be distinct."*Id.* at 307 (citation omitted). The court stated that this distinctiveness requirement "focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity."*Id.* at 307 (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994)). The court found that

> The requirement of distinctiveness between the defendants and the enterprise, however, was met here. The jury could reasonably have concluded that the RICO persons ... were a separate and distinct assortment of public officials, private individuals and corporations who used their political power to influence the Town of Delaware's exercise of governmental authority over the plaintiffs' development. From the evidence adduced at trial, there was sufficient evidence from which a reasonable jury could conclude that the named defendants were separate, culpable parties and that the alleged enterprise, the Town of Delaware, was the "passive instrument or victim of [their] racketeering activity."

*Id.*

Finally, in *Evans v. City of Chicago,* No. 00 C 7222, 2001 WL 1028401 (N.D.Ill. Sept.6, 2001) (Gettleman, J.), plaintiff's complaint alleged that several Chicago police officers

**\*14** conduct[ed] the affairs of an enterprise, the Chicago Police Department, through a pattern of racketeering activity against the plaintiff, including beatings, threats, strip searches, false arrests, evidence planting, perjury, and malicious prosecution, in order to obstruct justice, and intimidate and retaliate against a witness in a death investigation and related federal civil suit.

*Id.* at \*7. Plaintiff also alleged twelve separate incidents in which one or more of the officers took an action that was "further part of the conspiracy," and that the officers' harassment of him followed a

statement he made to the media and continued through his incarceration pending trial on the allegedly false charges brought against him. *Id.* The court noted that the Seventh Circuit Court of Appeals has found that the Chicago Police Department functioned as an enterprise. *Id.* (citing *Kovic,* 684 F.2d at 516-17;*United States v. Ambrose,* 740 F.2d 505, 512 (7th Cir.1984)). The court found that "the complaint sufficiently alleges that the Officers used the Chicago Police Department as a vehicle through which they could carry out their agreement to intimidate and retaliate against plaintiff, a witness against two of the Officers in a death investigation and related federal civil suit."*Id.* at *8.

Plaintiffs urge that here, as in *Evans,* Defendants "used the Village and the Police Department as the vehicle through which they could carry out their agreement to intimidate and retaliate against Plaintiffs and witnesses[ ] and influenc[e] the outcome of federal and state court proceedings."(Pl.12(b)(6) Resp., at 6.) Defendants maintain that *Evans* is distinguishable, as Plaintiffs have alleged an association-in-fact enterprise. (Def.12(b)(6) Reply, at 6.) <u>FN25</u> Indeed, as the court reads the Complaint, Plaintiffs do not contend that the enterprise consisted solely of the Village and the SPD. Rather, Plaintiffs allege that all Defendants, as well as "others known and unknown to Plaintiffs," were associated in fact and constituted a separate "enterprise." (Cmplt.¶ 93.)

> <u>FN25.</u> Defendants' Reply Memorandum in Support of Motion to Dismiss is cited as "Def. 12(b)(6) Reply, at ___."

Whether Plaintiffs allege that the enterprise consisted of an association-in-fact of all Defendants, or merely the Village and the SPD, the court concludes that Plaintiffs have not identified an enterprise that is distinct from Defendants themselves. If Plaintiffs believe that the Village and the SPD constituted the enterprise, their claim fails, for, as noted, a RICO defendant must be separate and distinct from the enterprise. *Stachon,* 229 F.3d at 676 n. 3. If Plaintiffs contend that the Village and the SPD were part of a larger association-in-fact, Plaintiffs have failed to allege a structure or purpose for such an organization separate from the alleged predicate acts.

The Seventh Circuit Court of Appeals in *Stachon* and *Richmond, supra,* set forth the minimal standards for alleging the existence of an enterprise. In *Stachon,* plaintiffs/appellants claimed that United Consumers Club, Inc. ("UCC"), a buying club in which paying members purchased merchandise through UCC catalogs, as well as five of its officers and/or directors, violated RICO by fraudulently representing that UCC members had access to high quality merchandise at wholesale prices. 229 F.3d at 674. Plaintiffs/appellants maintained that in furtherance of this scheme to defraud consumers about the benefits of UCC membership, defendants/appellees conducted and conspired to conduct or engage in a pattern of mail and wire fraud activity through an enterprise consisting of "Defendants, past and present UCC franchisees, manufacturers and wholesalers, and UCC members."*Id.* In affirming dismissal of the RICO claim, the court stated that

**\*15** we cannot accept Appellants' vague allegations of a RICO enterprise made up of a string of participants, known and unknown, lacking any distinct existence and structure. While Appellants had ample opportunity to adequately allege a RICO enterprise, they fail to show that the acts complained of in this case were the "work of an organization, however loose-knit."*Bachman,* 178 F.3d at 932. When we liberally construe the allegations in the amended complaint, the most Appellants may be able to establish is a pattern of racketeering activity through the purported scheme to defraud consumers. To withstand Appellees' motion to dismiss, however, Appellants must present something more than this and assertions of conspiracy; otherwise, "every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation."*Bachman,* 178 F.3d at 932. From *Bachman,* we know that is not the law.

....

This court has repeatedly stated that RICO plaintiffs cannot establish structure by defining the enterprise through what it supposedly does. See *Jennings,* 910 F.2d at 1440 ("[A]lthough a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does."). Appellants essentially do this in failing to offer the slightest sign of a "command structure" separate and distinct from UCC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(which is not the purported enterprise).*Id.* at 1440 n. 14.... In any event, Appellants offer nothing to show that this group of participants ever functioned as an ongoing RICO organization. As a consequence, the RICO claim is worthy of dismissal, notwithstanding whether the participants had a common purpose.

*Id.* at 676-77 (footnote omitted).

Similarly, in *Richmond, supra,* plaintiff alleged that three corporate defendants, which purportedly forced her to pay for excessive automobile insurance, constituted a RICO enterprise, which plaintiff named the "Nationwide Group," a group that included at least four other entities and that may have included additional businesses as well. *Id.* at 645.The complaint also alleged a second enterprise, consisting of the Nationwide Group plus unnamed car dealers. *Id.* In affirming dismissal, the court found that the complaint contained only "a nebulous, open-ended description" of these enterprises and provided no sign of "structure, continuity and common course of conduct." 52 F.3d at 645.

Plaintiffs suggest this case can be distinguished from *Stachon* and *Richmond,* pointing out that the alleged enterprises in those cases "consisted either of a random collection of contracting entities, independent actors committing criminal acts within a particular industry, consumer fraud, or a manufacturer selling a product through independent distributors."(Pl.12(b)(6) Resp., at 7.) As noted, Plaintiffs claim that Defendants, as well as "others known and unknown to Plaintiffs," were associated in fact and "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise."(Cmplt.¶¶ 93, 95.) In the court's view, these conclusory allegations fail to identify any sort of structure, organization, hierarchy, or consensual decision making. *Cf. Shapo,* 246 F.Supp.2d at 962 (rejecting conclusory allegations that the association-in-fact enterprise "functioned in a hierarchical decision-making structure as a continuing unit from at least 1989 to 1996 ...") Nothing in the allegations signals the existence of a " 'command structure' separate and distinct from" Defendants themselves. *See Stachon,* 229 F.3d at 676.

*16 Equally unavailing is Plaintiffs' assertion that ¶¶ 18-25 of the Complaint set forth a RICO enterprise. As noted, those paragraphs identify Defendants and allege that Sherman has used the Village for his political and personal benefit; that Sherman has repeatedly reappointed Stultz after the Village Board has voted to terminate him; that Sherman and Stultz "are close political allies"; and that Sherman and Stultz twice attempted to promote Rambo unlawfully. The court finds that, although these statements describe what Defendants allegedly did, they say nothing about the structure of the purported enterprise itself. *Cf. Jennings,* 910 F.2d at 1440. At most, these assertions merely identify "a group of people who get together to commit a 'pattern of racketeering activity.' " *See Stachon,* 229 F.3d at 675 (quoting *Richmond,* 52 F.3d at 645). Absent any sign of an organizational structure, Plaintiffs' allegations are insufficient even under the liberal pleading standards of Rule 8(a).

Even assuming Plaintiffs alleged an enterprise with sufficient structure, Plaintiffs have not alleged that this purported enterprise had a purpose separate from the alleged predicate acts. Plaintiffs argue that the purpose of the alleged enterprise was

tampering and intimidating witnesses, victims, and various Plaintiffs to testify against the other Plaintiffs and to provide false evidence against Plaintiffs in various federal proceedings; obstructing justice for their own political benefit; corruptly influencing the outcome of federal and state court proceedings; and engaging in bribery and extortion as chargeable under Illinois law.

>Pl.12(b)(6) Resp., at 4.) Defendants note, correctly, that this asserted "purpose" is nothing more than a laundry list of the alleged predicate acts: obstruction of justice; obstruction of criminal investigations; tampering with witnesses and victims; retaliating against witnesses and victims; interference with commerce, robbery, or extortion; and engaging in racketeering. (Cmplt.¶ 90.) As Plaintiffs offer nothing to show that Defendants ever functioned as an ongoing RICO organization or had any goals separate from the alleged predicate acts, Count I must be dismissed against all Defendants.[FN26]

> FN26. As the court finds that Plaintiffs have not sufficiently alleged an "enterprise" under RICO, the court declines to address Defendants' argument that Plaintiffs have failed to allege a pattern of racketeering

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activity.

C. Counts II and III (Political Affiliation and Speech)

In Count II of their Complaint, Plaintiffs claim that they "have been subjected to retaliation based on their political affiliation in violation of their First Amendment rights." In addition to the allegations described above, Plaintiffs make the following allegations in Count II. First, in or about April 1999, the day after the election for Village Trustees, Sauter and Presley "were removed from the special assignment of Range Officer."(Cmplt.¶ 108(a).) One of Sauter's commanding officers, who is not named, told Sauter that he was removed as Range Officer because he had voted for and supported the political opposition to Sherman. (*Id.*) Second, Sauter was "recently" passed over for a promotion to sergeant, to which he was entitled, in favor of "an officer who supported [Sherman] and who had not complained about unlawful treatment of other employees or spoke[n] about other matters of public concern."(*Id.* ¶ 108(b).)

*17 Third, on an unspecified date or dates, Rambo wrote unspecified "false and misleading" memoranda regarding Sauter "in an attempt to set him up for disciplinary action."(*Id.* ¶ 108(c).) Fourth, Defendants have subjected Sauter to "unwarranted and disproportionate disciplinary action and made false allegations and charges against him."(*Id.* ¶ 108(d).) Fifth, Sauter "was subjected to a hostile work environment, harassed, and denied training, secondary employment, and other benefits of employment based on his political affiliation and support for the political opposition to" Sherman. (*Id.* ¶ 108(e).)

Sixth, Osantowski was "denied training, promotions, and advancement opportunities; treated differently in the terms and conditions of his employment; and subjected to unwarranted disciplinary action, false charges, and frivolous complaints."(*Id.* ¶ 109.) Unlike all other sergeants, Osantowski was not offered training required for promoting to the rank of lieutenant. (*Id.*) When Osantowski asked Rambo why he was not selected to attend the training, Rambo replied, "you don't need it because I say you don't need it."(*Id.*)

Seventh, "Defendants have attempted to interfere with [Lamastus's] prospective business, defamed his character, and subjected him to false, misleading, and frivolous complaints."(*Id.* ¶ 111.) Finally, Plaintiffs claim that Defendants have subjected other employees who supported "the political opposition" to discipline, denial of special assignments and promotions, retaliation, forced resignation, defamation, litigation, and false complaints," and have denied contractors' bids in favor of bids by supporters of Sherman and his political allies. (*Id.* ¶ 114.) In Count III, Plaintiffs urge that they "engaged in protected free speech on matters of public concern, and subsequently were subjected by Defendants to actions that had the effect and intent of silencing Plaintiffs' speech in violation of their First Amendment rights."(*Id.* ¶ 124; *see also id.* ¶ 3.)

Defendants argue that Count II should be dismissed as to all Plaintiffs except **Newkirk**, and that Count III should be dismissed entirely, on the following grounds: (1) Plaintiffs do not plead a claim for relief in Count II on behalf of Presley; (2) the claims in Counts II and III as to Sauter, Osantowski, Tieri, Lamastus, and Palcek are either time-barred or are not actionable for other reasons; and (3) Plaintiffs fail to identify any specific statements in Count III. (Def.12(b)(6) Motion, at 1.) The court considers each argument in turn.

1. Count II as to Presley

Defendants urge that Plaintiffs do not allege any conduct that violated Presley's First Amendment rights to political association. (*Id.* at 7.) The court agrees with Plaintiffs, however, that the allegations in ¶¶ 1 through 86 of the Complaint, which are incorporated and realleged in Count II (Cmplt.¶ 105), sufficiently identify several adverse acts that are either undated or occurred within the two-year limitations period:

*18 • Stultz interrogated Sauter regarding an incident involving the arrest of two or three "juvenile suspects." (*Id.* ¶¶ 40, 50.) Rambo ordered Sauter, Presley, and another unidentified officer to provide a "to/from" regarding the incident. (*Id.*) In an attempt to "intimidate and scare" Sauter, Stultz claimed that there was an excessive force claim against them and that the Village could not indemnify them if the suspects sued them. (*Id.*) Defendants "encouraged, coerced, and/or conspired with the juvenile suspects to file false complaints against" Sauter, Presley, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the other unidentified officer, who resigned as a result of this incident. (*Id.*)

- Throughout the employment of Plaintiffs Sauter, Presley, Osantowski, and Lamastus with the SPD, Defendants Stultz, Rambo, and Seehausen "told and directed" unidentified employees (presumably of the SPD) to "watch" these Plaintiffs, to write complaints against them, and to "set them up for disciplinary action and/or termination."(*Id.* ¶¶ 37, 49, 55, 71.)

- In or about late 2001, Stultz and Rambo "made, directed, and/or conspired with another to make false, defamatory, and outrageous allegations against Plaintiffs Presley and Osantowski, claiming that [Osantowski] and/or Presley had 'handcuffed a woman to her bed for sexual gratification.'" (*Id.* ¶ 53.) Plaintiffs maintain that Presley and Osantowski had merely "responded to a domestic disturbance and [had] handled the call appropriately." (*Id.*) Nearly one year later, "Rambo questioned [Presley] regarding the incident and subjected him to a formal departmental interrogation" in which Rambo "deprived [Presley] of his right to counsel." *Id.*) Presley was never given a copy of the complaint. (*Id.*) Plaintiffs claim that "[t]hese false allegations were made ... in an effort to intimidate [Presley] from testifying on [Osantowski's] behalf" in Osantowski's lawsuit against the Village. (*Id.* ¶ 54.). (*See id.* ¶¶ 49-50, 53-54.)

The court concludes these allegations are sufficient to establish that Presley was the target of retaliation and therefore declines to dismiss Count II as to Presley.

2. Timeliness of Counts II and III as to Sauter, Osantowski, Tieri, Lamastus, and Palcek

Defendants contend that none of the injuries to Lamastus and only one injury each to Sauter, Tieri, Palcek, and Osantowski (discussed below) alleged in Counts II and III occurred within two years prior to July 21, 2003, the date Plaintiffs filed their First Amended Complaint against Defendants. (Def.12(b)(6) Motion, at 8-10) (citing Cmplt. ¶¶ 17, 38, 41-42, 47, 51-52, 56, 59-61, 63-64, 66, 72-75, 78-83, 86.) In Illinois, § 1983 actions must be filed within two years from the date "when the plaintiff knows or should know that his or her constitutional rights have been violated."*Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir.2004) (quoting *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir.1993)). Plaintiffs implicitly argue that all of Defendants' alleged acts against Plaintiffs should be considered part of a single, ongoing harassment of Plaintiffs and, therefore, that all such acts are within the statute of limitations period. (Pl.12(b)(6) Resp., at 19.) Plaintiffs correctly observe that § 1983 plaintiffs must plead and prove a pattern and practice "so permanent and well-settled as to constitute a 'custom or usage' with the force of law."(*Id.*) The case they cite, however, *Bohen v. City of East Chicago*, 799 F.2d 1180 (7th Cir.1986), addresses *Monell* liability, not timeliness principles. *Id.* at 1188-89 ("Under § 1983, actions of a state entity's employees are 'attributed to the state' entity itself if those actions are in furtherance of the entity's 'policy or custom'").

*19 More relevant are Plaintiffs' citations to cases that address the "continuing violation" doctrine in employment discrimination law. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir.1993), for example, was a Title VII action for sexual harassment in which many of the alleged instances of physical advances by plaintiff's supervisor had occurred more than 300 days before plaintiff filed her EEOC charge. The court determined that plaintiff's claims rested not on her supervisor's physical advances alone but also on his hostile treatment of her once he was rebuffed, and on the company's responsive actions, which took place within the 300-day limitation period. *Id.* at 532 n. 11.More recently, in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court explained that a Title VII hostile work environment claim

is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs urge that "[t]he analysis [presumably of § 1983 claims] is similar to harassment claims."(Pl.12(b)(6) Resp., at 19.) Their position finds support in *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014 (7th Cir.2003), in which the Seventh Circuit concluded that *Morgan* applies to both Title VII and § 1983 claims. *Id.* at 1036 n. 18 ("[t]he Supreme Court's ruling in [*Morgan* ], although discussing the continuing violation doctrine in the Title VII context, applies equally to § 1983 cases").*See also Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir.2003) (in case alleging retaliation for exercise of First Amendment rights, court found "no principled basis upon which to restrict *Morgan* to Title VII claims, and we therefore conclude that the Supreme Court's reasoning must be applied to the [plaintiffs'] § 1983 claims").

Plaintiffs expressly allege that Sauter was subjected to a hostile work environment and harassment based on his political opposition to Defendant Sherman. (Cmplt.¶ 108(e).) Sauter also alleges at least one act contributing to the harassment that is undated or that occurred during the limitations period. (*See, e.g., id.* ¶ 108(b), Sauter was recently denied a promotion to Sergeant.) As for the remaining Plaintiffs, there are no express First Amendment hostile environment claims on behalf of Tieri, Lamastus, or Palcek, and Osantowski's hostile environment allegations relate solely to his claim of race discrimination. (Cmplt. ¶¶ 151, 153; Pl. 12(b)(6) Resp., at 19.) Plaintiffs note that "ALL Plaintiffs incorporate and reallege against ALL Defendants" the allegations set forth in ¶¶ 1 through 86. (Pl.12(b)(6) Resp., at 19, 22.) The hostile environment claims, however, are not included in those paragraphs and, in any event, are expressly limited to **Newkirk** and Sauter. As to Tieri, Palcek, Osantowski, and Lamastus, the court finds that any alleged retaliatory adverse acts prior to July 21, 2001 are time-barred.

*20 With this in mind, the court turns to whether those four Plaintiffs have alleged any acts of retaliation for speech or political affiliation that post-date July 21, 2001. On the issue of retaliation, Plaintiffs allege that a May 12, 2002 newspaper article quoted Stultz as stating that the investigation (presumably of the allegedly false charges that Sauter, Tieri, and Palcek had stolen guns from the SPD) "started when the department staff began to notice several guns officers had confiscated were missing from the inventory."(Cmplt. ¶¶ 45, 69.) [FN27] Plaintiffs contend that "Stultz and/or Rambo provided this information about the ATF investigation to the press in hopes and with the effect of destroying [Sauter's and Tieri's] character and reputation."(*Id.* ¶¶ 45, 70.)

> FN27. The Complaint does not state whether the grand jury investigation was continuing in May 2002, although, as noted, Plaintiffs do claim that Rambo provided false testimony to the grand jury in March 2002. (Cmplt.¶¶ 44, 68.)

Defendants claim that "[t]here is no nexus between that statement and Tieri," as the statement does not identify Tieri by name or imply his involvement in the guns' disappearance. (Although Defendants have not so stated, the court presumes from this argument that the article did name Sauter and Palcek.) (Def.12(b)(6) Reply, at 23.) Defendants urge that absent some reference to Tieri, the quoted language in the article "could not possibly deter Tieri's right to political affiliation or free speech."(*Id.*) (citing *Power v. Summers*, 226 F.3d 815, 820 (7th Cir.2000) ("Any deprivation under color of law that is likely to deter the exercise of free speech ... is actionable").) Given that Tieri was implicated in the alleged stolen guns incident, Plaintiffs may be able to establish that Tieri would have understood that Stultz's accusations related to him. The court thus declines to dismiss Counts II and III as to Tieri on this basis.[FN28] To the extent Defendants do not deny that Palcek was named in the newspaper article, the motion to dismiss Counts II and III as to him is also denied.

> FN28. As noted below, however, the court dismisses Count III against Tieri, as Plaintiffs have failed to identify any protected speech or conduct by Tieri.

Plaintiffs claim to have alleged retaliation against Osantowski based on their assertion that in or about late 2001, Stultz and Rambo "made, directed, and/or conspired with another to make false, defamatory, and outrageous allegations ... that [Osantowski] and/or Presley had 'handcuffed a woman to her bed for sexual gratification.'" (Cmplt.¶ 53.) Plaintiffs also claim that, within the

limitations period, Osantowski was "denied training, promotions, and advancement opportunities; treated differently in the terms and conditions of his employment; ... subjected to unwarranted disciplinary action, false charges, and frivolous complaints;" and "is the only sergeant who has *not* been offered specialized training necessary to be considered for a promotion to Lieutenant." (*Id.* ¶ 109 (emphasis added).) Defendants maintain that, as part of a settlement of his Title VII lawsuit, Osantowski was promoted to Sergeant and released any civil rights claims based upon the investigation of the alleged handcuffing incident. (Def.12(b)(6) Motion, at 11-12.) In support, Defendants attach copies of the July 19, 2001 complaint and a purported agreement between Osantowski and the Village dated January 22, 2002. (Exs. A-B to Def. 12(b)(6) Motion.)

*21 Plaintiffs urge that this court may not consider these documents without converting Defendants' motion to one for summary judgment. If, on a 12(b)(6) motion, matters outside the pleadings are presented to and not excluded by the court, then the court must convert the motion to one for summary judgment and give all parties "reasonable opportunity to present all material made pertinent to such a motion by Rule 56."*R.J. Corman Derailment Servs., LLC v. International Union of Operating Eng'rs, Local Union 150, AFL-CIO,* 335 F.3d 643, 647 (7th Cir.2003) (citing FED. R. CIV. P. 12(b)). Defendants seek such conversion with respect to Counts II and III against Osantowski (Def.12(b)(6) Reply, at 22), but the court declines this invitation. It will, however, entertain a prompt motion for summary judgment on the issue of the scope and effect of the previous release of claims by Osantowski. Defendants' motion to dismiss Counts II and III as to Osantowski is denied.[FN29]

> FN29. As the court finds that Plaintiffs have stated a claim under § 1983 as to Tieri, Osantowski, and Sauter, the court need not address Defendants' arguments that Plaintiffs cannot state a claim against Rambo, Sherman, or Stultz relating to Rambo's allegedly false grand jury testimony. (Def.12(b)(6) Motion, at 11; Def. 12(b)(6) Reply, at 25-28.)

As evidence of timely retaliation against Lamastus, Plaintiffs point to their allegations that "Defendants have attempted to interfere with [Lamastus's] prospective business, defamed his character, and subjected him to false, misleading, and frivolous complaints," all of which, they claim, occurred within the limitations period. (Complt.¶ 111.) The Supreme Court has explained that a claim for relief is sufficient if it gives a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley,* 355 U.S. at 47). The court finds that the conclusory allegations in ¶ 111 fail to give Defendants even minimal notice of the grounds upon which those allegations rest.[FN30] In any event, as noted, Lamastus has not been employed by the Village since late 2000, before the limitations period began. (Cmplt.¶ 16.) As Plaintiffs fail to point to any actions against Lamastus within the limitations period, Counts II and III must be dismissed as to him.

> FN30. For example, the Complaint does not describe the "prospective business" with which Defendants allegedly interfered.

3. Specific Statements in Count III

Defendants next argue that Count III must be dismissed entirely on the ground that Plaintiffs have not identified any specific statements they made that resulted in the alleged retaliation. (Def.12(b)(6) Motion, at 12.) In support, Defendants cite *Kyle v. Morton High School,* 144 F.3d 448, 454 (7th Cir.1998), a First Amendment retaliation case, in which the court found that nothing in the complaint indicated what speech or conduct the defendant had allegedly retaliated against. The court explained that "[t]o avoid dismissal, the complaint for a First Amendment violation must at least put the defendants on notice that some specific speech or conduct by the plaintiff led to the termination."*Id.*

Plaintiffs urge that they have alleged "sufficient statements and conduct to suggest that they spoke out about and engaged in conduct of matters of public concern."(Pl.12(b)(6) Resp., at 24) (citing Cmplt. ¶¶ 28, 29, 33, 36, 48, 54, 62.) In addition, Plaintiffs point to their allegations that they "engaged in protected free speech on matters of public concern, and subsequently were subjected by Defendants to actions that had the effect and intent of silencing Plaintiffs' speech in violation of their First

Amendment rights."(Cmplt.¶¶ 3, 124.)<sup>FN31</sup> Defendants urge that "none of these allegations relate[s] to any supposed statements by Plaintiffs for which Defendants could have retaliated."(Def.12(b)(6) Reply, at 28-29.)

> FN31. Plaintiffs also claim that they "have continued to be retaliated against for the filing of this lawsuit, which is clearly a matter of public concern," but offer no support for this contention. (Pl.12(b)(6) Resp., at 24.) The court declines to consider these conclusory and unsupported assertions not stated in the Complaint.

*22 The court finds that these allegations do identify specific conduct by **Newkirk**, Osantowski, Sauter, and Presley for which Defendants allegedly retaliated within the limitations period. First, in retaliation for **Newkirk's** May 10, 2000 refusal to make false complaints against Sauter, she was terminated at some point after January 4, 2002. (Cmplt.¶¶ 28, 36.) <sup>FN32</sup> Second, in an effort to intimidate Osantowski into dismissing his discrimination lawsuit, Rambo offered a female job applicant a TCO position with the Village in return for her false testimony that Osantowski had sexually harassed her in late 2001, and Seehausen accused him of stealing bond money at some point between 2000 and 2002. (*Id.* ¶¶ 57, 62.)Finally, on unspecified dates, Defendants filed false charges and encouraged others to file a lawsuit against Sauter and Presley to deter them from testifying on Osantowski's behalf in Osantowski's lawsuit. (*Id.* ¶¶ 47, 48, 53, 54.)As Plaintiffs fail to identify any speech or conduct by Plaintiffs Palcek or Tieri, Count III must be dismissed as to those Plaintiffs.

> FN32. The court expresses no opinion about whether Plaintiffs can maintain a claim when, as here, more than 18 months passed between a plaintiff's conduct and alleged retaliatory acts, as the parties have not addressed that issue.

D. Claims for Punitive Damages against Village in Counts II and IV

Defendants contend that Plaintiffs may not seek punitive damages against the Village, citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), in which the Court held that municipalities are immune from punitive damages under § 1983. *Id. at 271.*(*See also* Def. 12(b)(6) Motion, at 13.) Plaintiffs urge that they are not seeking punitive damages against the Village but, rather, "[p]unitive damages as allowed by law as against all individual Defendants."(*See* Cmplt., at 24 ¶ G, 30 ¶ G.) It is undisputed, then, that to the extent Plaintiffs seek punitive damages against Defendant Village of **Steger** in Counts II and IV, those prayers for damages must be dismissed.

E. Count VII (Gender Discrimination)

Defendants argue that **Newkirk** cannot maintain a claim for gender discrimination under Title VII because her EEOC Charge of Discrimination "does not contain any description of events which could be understood to allege sex discrimination."(Def.12(b)(6) Motion, at 13.) Our Court of Appeals has explained that a plaintiff may not bring a Title VII claim that was not included in the plaintiff's EEOC charge unless the claim is " 'like or reasonably related' to the EEOC charge, and can be reasonably expected to grow out of an EEOC investigation of the charges."*Sitar v. Indiana Dep't of Transp.,* 344 F.3d 720, 726 (7th Cir.2003) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir.1976) (*en banc* )). Defendants note that **Newkirk** checked only the boxes marked "Race," "Retaliation," and "Disability" on her EEOC charge, and that her charge alleged, in relevant part, that

[d]uring the course of my employment[,] I was subjected to unequal terms and conditions in that Respondent would send less senior and less experienced non-Black, non-Disabled co-workers to training, contrary to established practices. Respondent would not allow me to search female prisoners because of my disability, although Respondent certified and trained me to do so. I was also harassed in the form of unwarranted discipline for violations of Respondent['s] policy whereas my non-Black, non-Disabled co-workers were not disciplined. I was told that the harassment would cease and I would be given a full time position if I cooperated in making false statements against a Black, Male Police Officer who [had] filed a discrimination charge....

*23 I believe I have been discriminated against because of my race, Black [,] and retaliated against in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

violation of the Civil Rights Act of 1964, as amended[,] and discriminated against because of my disability in violation of the American[s] with Disabilities Act of 1990.

(Ex. C to Def. 12(b)(6) Motion.)

Plaintiffs contend that whether **Newkirk's** EEOC charge put Defendants on notice as to her gender discrimination claims is an issue of fact that cannot be resolved on a motion to dismiss. (Pl.12(b)(6) Resp., at 25.) In support, Plaintiffs cite *Jenkins, supra,* in which plaintiff charged her former employers with denying her promotions and better assignments and ultimately terminating her employment because of her "race, sex, black styles of hair and dress." 538 F.2d at 165. On her EEOC charge, plaintiff had checked the box indicating that her discrimination claim was based on "Race or Color," but did not check the box marked "Sex." *Id.* at 167. In reversing the district court's denial of class action status, the court found that the allegations in plaintiff's charge that her supervisor had discriminated against her because of her hairstyle, that he had "accused me of being the leader of the girls on my floor," and that a white employee "who associated with me might have been denied her promotion because of her association with me" were sufficient to charge sex discrimination. *Id.* at 169.

Defendants note, correctly, that the *Jenkins* court determined that plaintiff's EEOC charge was sufficient solely from the charge itself. Nothing in **Newkirk's** EEOC charge, Defendants contend, similarly notified them of any sex discrimination claims. The court agrees that none of **Newkirk's** allegations in the charge are suggestive of gender discrimination. Indeed, the only mention of gender relates to **Newkirk's** charge of disability discrimination, not sex discrimination: "Respondent would not allow me to search female prisoners *because of my disability.*"(EEOC Charge) (emphasis added.) Count VII, therefore, must be dismissed.

F. **Steger** Police Department

Defendants urge that Defendant SPD must be dismissed because it does not have a legal existence separate from the Village. (Def.12(b)(6) Motion, at 13.) Our Court of Appeals has suggested, and several courts in this district have found, that municipal police departments are not separate entities from the municipality itself and, therefore, are not suable. *See, e.g., Chan v. Wodnicki,* 123 F.3d 1005, 1007 (7th Cir.1997) (noting that the district court had dismissed the Chicago Police Department "because it was not a suable entity"); *West v. Waymire,* 114 F.3d 646 (7th Cir.1997) ("The naming of the Town's Police Department as a defendant adds nothing; it is almost certainly not a suable entity separate from the Town"); *Gutzwiller v. City of Chicago,* No. 03 C 7598, 2004 WL 1595369, at *4 (N.D.Ill. July 13, 2004) ("The Chicago Police Department does not enjoy a legal existence that is independent of the City of Chicago and cannot be sued as a separate entity"); *Gray v. City of Chicago,* 159 F.Supp.2d 1086, 1089 (N.D.Ill.2001) ("The Police Department is not a suable entity, but merely a department of the City of Chicago which does not have a separate legal existence").

*24 Plaintiffs cite no contrary legal authority, but merely assert that the SPD should remain as a named Defendant because it is part of the "enterprise" under RICO and "is included by name as the [C]omplaint alleges that the Chief of Police has final policy making authority under § 1983 for decisions as they relate to Police Department matters."(Pl.12(b)(6) Resp., at 25.) Notwithstanding Plaintiffs' objections, the clear weight of authority holds that the **Steger** Police Department is not a suable entity and, therefore, must be dismissed as a Defendant.

II. Motion to Strike

Defendants move to strike "immaterial, impertinent and scandalous matter alleged in" ¶¶ 20 and 101(e)-(f) and a portion of ¶ 114 of Plaintiffs' Complaint pursuant to FED. R. CIV. P. 12(f). (Def.12(f) Motion, at 1.) [FN33] Specifically, Defendants seek to dismiss Plaintiffs' allegation in ¶ 114 that Defendants engaged in "a custom and practice of violating" First Amendment rights by denying unidentified individuals "legitimate contracts with bids or an opportunity to engage in the bidding process based on their political affiliation and support; and allowing potential and existing contractors who are political supporters of Sherman and the candidates he endorses for other offices to obtain Village contracts without the required bidding process."Plaintiffs respond that these paragraphs are "highly relevant" to their RICO and § 1983 claims,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

but do not explain how. (Pl.12(f) Resp., at 2-4.) [FN34]

> FN33. Defendants' Rule 12(f) Motion to Strike Immaterial, Impertinent and Scandalous Matter Alleged in Plaintiffs' Second Amended Complaint is cited as "Def. 12(f) Motion, at __."
>
> FN34. Plaintiffs' Response to Defendants' Rule 12(f) Motion to Strike is cited as "Pl. 12(f) Resp., at __."

Rule 12(f) provides that a court may strike from any pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Our Court of Appeals has explained that "[a]llegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting party prejudice." *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664-65 (7th Cir.1992) (citations omitted). The decision whether to strike material as scandalous is within the district court's discretion, *id.*, though such motions are disfavored as "drastic remedies" and are rarely granted. *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 2 F.Supp.2d 1028, 1033 (N.D.Ill.1998) (Norgle, J.) (citing cases); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1380 (1990).

As the court has dismissed Count I of Plaintiffs' Complaint, including ¶ 101(e)-(f), Defendants' motion to strike those subsections is moot. *Cf. 3Com Corp. v. Electronics Recovery Specialists, Inc.*, 104 F.Supp.2d 932, 942 (N.D.Ill.2000) (denying motion to strike as to dismissed claim). Defendants argue that ¶ 20 is "wholly unrelated to [Plaintiffs'] own RICO claim [and is] for the sole purpose of embarrassing and harassing Defendant Sherman." (Def.12(f) Motion, at 2-3.) Defendants also urge that the quoted portion of ¶ 114 is irrelevant, as Plaintiffs do not allege that they themselves were denied any opportunities to bid on Village projects. (*Id.* at 4.) To the extent these claims may point to evidence that Defendants were motivated to violate Plaintiffs' free speech and political association rights based on Plaintiffs' political affiliation, the court declines to strike them at this time. Defendants will have ample opportunity after discovery to show that these allegations are baseless or irrelevant to Plaintiffs' claims.

### CONCLUSION

*25 For the reasons stated above, Defendants' motion to dismiss (Docket No. 28-1) is granted in part and denied in part. Specifically, Count I is dismissed against all Defendants; Count II is dismissed as to Plaintiff Lamastus, Count III is dismissed as to Plaintiffs Lamastus, Palcek, and Tieri; and Count VII is dismissed against all Defendants. In addition, all claims against Defendant **Steger** Police Department are dismissed and, to the extent Plaintiffs seek punitive damages against Defendant Village of **Steger** in Counts II and IV, those claims are dismissed. Defendants' motion to strike (Docket No. 30-1) is denied.

N.D.Ill.,2004.
Newkirk v. Village of Steger
Not Reported in F.Supp.2d, 2004 WL 2191589 (N.D.Ill.), RICO Bus.Disp.Guide 10,752

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.